Good morning again. Welcome to our in-bank court. We have two cases to argue. This morning we will take a short recess, five or ten minutes, after the first case and then come back in. With respect to the first case, my sheet shows that those who are arguing or exercising their right to have the uninterrupted time before the court begins to ask you questions. It is my understanding that you may or may not take all of that time, but if you don't, then you will let the court clearly know that you are now taking questions and I would ask you to do so. The main rules are pretty simple. Principally, stay in the microphone and keep your voices up, you know, loud so we can hear up there as well as we get a good recording on it. The light system is what it is and you follow it. The main purpose is to help us out by answering the court's questions, so the red light doesn't save you from answering somebody's questions. But in the answers, try to be as succinct and complete in your answers as possible. If you have trouble figuring out where the question is coming from, I'll do my best to try to send you in the right direction as far as that goes. That said, we'll call up Vesey v. Abbott. First is Mr. Keller. May it please the court, I'll spend just a few brief minutes of uninterrupted time, at which point I will waive the remainder of my time. The panel correctly rejected the poll tax and discriminatory purpose findings. I'm going to focus on the Section 2 effects test and the Crawford substantial burden claim, starting with the Section 2 effects test. Section 2B of the Voting Rights Act informs us that what a denial or an abridgment of the right to vote means is a denial of equal opportunity. In other words, the statutory text informs that this statute and liability must be premised on a denial of equal opportunity, not some disparate outcome at some phase in the process of voting. And the Seventh Circuit in Frank was correct in noting that. And the Seventh Circuit was also correct in noting that a theory like the district courts and plaintiffs for Section 2 liability would sweep away almost all registration and voting rules by taking a disparity that is not connected to voter turnout, voter turnout participation, and coupling it with the fact that income is correlated with race. In the North Carolina district court that just upheld North Carolina's voter I.D. law made the same point. Judge Kaczynski's opinion of the Vericon made the same point. And this is not hyperbole. In North Carolina right now, laws are being challenged about registration before election day being a Section 2 violation, increasing voting, reducing the number of days of early voting. In Ohio, age restrictions are being challenged. The list goes on. Voter registration itself, Tuesday elections, felon disenfranchisement laws, all of these would be jeopardized under a theory of liability that the district court adopted. And plaintiffs have no limiting principle. That's where that theory goes. Here, the disparity in pre-existing I.D. possession at an earlier point in time, first of all, was a very small disparity. Ninety-six percent of whites, ninety-four percent of Hispanics, ninety-two percent of African American registered voters. That's the small disparity we're talking about here. And in looking at that so-called no match list, that disparity does not even measure unequal opportunity. That is the burden to vote, the burden to actually possess I.D.s. In Texas, we offer free voter I.D.s. We offer free supporting documents to get those free voter I.D.s. That's the type of inquiry that would need to be examined. Plaintiffs, however, did not even attempt to put on voter turnout participation evidence. And this is not a reinforcement challenge. SB 14 took effect in June 2013. Trial was in October 2014, over a year later. In that time, we had a 2014 primary and runoff election. We had a 2013 statewide constitutional amendment election and five special elections. So, there was no turnout evidence. There was a small disparity. And on top of that, their theory of liability would sweep away almost all voting registration and turnout. It would sweep away almost all election laws. That cannot be what Congress intended in 1982 through the results test. Now, moving from Section 2 to the Substantial Burden Inquiry under Crawford. The plaintiff's claim here is essentially trying to relitigate Crawford. Crawford, the Supreme Court held that the burden to obtain I.D.s. for most voters is going to be minimal. Now, here, under their statistic, 95.5% of Texans already possessed I.D. back before trial. So, this is facially valid. Now, going to any sort of an as-applied challenge, the Department of Justice's lawyers crisscrossed Texas with microphones in hand going to homeless shelters to try to find voters that were disenfranchised. They didn't find anyone. None of the 14 named plaintiffs faced a substantial burden. And the reason I would focus on the 14 named plaintiffs is because these are the best examples that they purportedly found after crisscrossing the state. Nine of the 14 can vote by mail without I.D. And in Texas, this is different from Wisconsin, in Texas we allow voters to vote by mail without I.D. if they're 65 or older or disabled. And there's no case that holds that that is not somehow a mitigation of whatever burdens may exist under voter I.D. law. So, that's nine of the 14. Three of the remaining 14 already had compliant I.D. One had a California driver's license and said she was intending to return to California upon college graduation. And the final named plaintiff testified that, yes, he could obtain a personal I.D. card satisfied SB 14. And so, the 14 named plaintiff situation confirms there's no Section 2 discriminatory effect as well as no Crawford as-applied violation because if there cannot be a substantial burden shown for an individual, there's certainly no denial of an equal opportunity to vote on account of race. And at that, I will waive the remainder of my uninterrupted time to answer any of the Court's questions. I have a question. Can you help me? Because it seems to me that this is really a facial challenge and it would not pass a facial challenge. And that if it was an as-applied challenge, the remedy would be to allow people to vote without the I.D. who are discriminated against. And so, I'm a little bit perplexed on that. So, you're right, Judge Elmore. Insofar as they're bringing a facial challenge, that would fail because 95.5% of Texans already have I.D.s. Insofar as the Court would go down the road of considering what an as-applied remedy would look like, I would suggest that procedures such as Indiana's indigency affidavit from Crawford would mitigate any potential burdens because their theory of liability is socioeconomic disparities. And if we're talking about as-applied relief, they have to marshal evidence that there are individual voters who face a substantial burden. And when we offer the mitigation of being able to vote by mail without I.D., virtually all of their anecdotes are looking at voters who are 65 or older and the burdens they face. But that's not the relevant inquiry. Do we have any precedent either way on whether or not you can have a facial relief in an as-applied challenge? You could not have facial relief. It appears that the relief sought by the United States, for example, is to enjoin Texas from enforcing the requirements of Sections 1 through 15 and 17 through 22. That's the relief sought, to enjoin from enforcing the law. And that seems to me that's the remedy you would seek in a facial challenge. So, I'm trying to figure out, is there any authority for giving an enjoining the law in an as-applied challenge, which is what I believe we have here? Yes. No, no. When there's facial relief sought, you have to show there's no set of circumstances in which that law can be applied. And that doesn't pass the Salerno test, and I don't think they argue it does. But on an as-applied challenge, is there any authority to request enjoining the entire statute? Insofar as they're raising the as-applied challenge, no. Because an as-applied challenge is different than what facial relief would require under the Salerno test. And that's one of the problems with what they're seeking, and that the evidence that they have brought forward is they want to sweep aside the entire law. And that's why I say that this really is trying to relitigate Crawford, because Crawford was about a facial challenge. And the court did the Anderson verdict balancing there. Now, if they want to point to certain differences between the Texas voter ID law and the Indiana law, although they're quite similar, as Indiana's amicus brief makes clear, pointing to differences though doesn't negate the fact that what the court held in Crawford was that getting ID and getting the documents to get ID is not a greater burden for almost all voters, hence going to the polls. Excuse me, sir. What's the state's position on the panel's – I mean, we are en banc, so the panel opinion is vacated, but for argument's sake, what would the state's position be on whether to remand the intentional discrimination finding? The court should render judgment for the state on that claim. I think the panel was correct in rejecting the discriminatory purpose claim, but I think the only misstep was instead of remanding, as the panel did, judgment should be rendered. Here, unprecedented discovery was given into privileged legislative materials, thousands of documents, dozens of legislator depositions, and as the panel rightly recognized, that turned up no evidence of discriminatory purpose whatsoever. And in that posture, no reasonable fact finder could conclude that there would be the clearest proof to override the legislature's stated intent of – Okay. Decide a case for me that applies this clearest proof standard in a context like this one. So the clearest proof language comes from ex post facto. Right. It doesn't come from a voting rights case or anything even relating to voting. So I'm asking for a case similar to voting in any respect that uses this clearest proof standard that you've announced. Well, what I would say, the courts look to McCleskey v. Kemp and Croft, this Court's precedent. And McCleskey, the Supreme Court, said if there are legitimate reasons for the legislature to adopt and maintain a law, courts will not infer a discriminatory purpose. And what Croft said, and this is very similar to the clearest proof language, is that courts should generally defer to the stated legislative intent. They should not psychoanalyze legislators' motives. Well, even if you're on a clear error standard, wouldn't you contend that there is still no material issue as to whether there was an intentional purpose? Absolutely. It was clear error to find discriminatory purpose. When there's unprecedented discovery and you have that quantum of direct evidence, which is the best evidence, and it turns up nothing, then discriminatory purpose cannot be found. Suppose this Court were to rule that there is a Section 2 violation under some formulation. What would the appropriate remedy be? I believe the Court would have a hard time writing that opinion and cabining it, but if it were to do so and find a liability under some theory that wouldn't explode all of or override all of our election laws, I think the proper remedy would have to be something tailored to the socioeconomic disparities, and that would be an Indiana-like indemnicy affidavit procedure, because that would be the type of procedure that would... So you're saying it would be not to invalidate the entire law, but to remand for a specifically tailored remedy? Yes, insofar as it be a tailored specific remedy. I believe this Court could fashion the remedy itself. Well, now, are you asking the Court to do that, or are you saying that a remand would require the state legislature to have the first crack at that? Well, insofar as the Court wanted to direct the opportunity for the legislature to act, I believe that would, in fact, be proper. Isn't that more than proper? Isn't that generally required in the redistricting cases? It absolutely is when you're giving the legislature an opportunity to fix whatever perceived violation may be. But again, the remedy in that posture, though, would be a very tailored remedy. It would not be facial invalidation. It would not be a requirement that would override photo ID requirements for most people. Let me ask you about the remedy, about the legislature. They're not going to meet between now and the presidential election in November, are they? They're not scheduled to. So are you saying we need to order the governor to call a special session of the Texas legislature to vote on this if we end up finding some violation and needing some remedy? I believe what the Court could do would be something along the lines of either a tailored remedy or not directing the governor to call a special session, but saying that if the governor wants to take the opportunity to call a special session. Well, the governor can always call a special session. We don't have to say that, right? Whether we say it or not, the governor could call a special session tomorrow and address this if he wanted to. True, although there is no — to back out a little bit, our position is there is no liability here, and any liability under Section 2 would have to show a voter turnout disparity. That's what Clement said. Let me ask you about that, Mr. Keller. I'm trying to understand exactly what the state's standard or test is. I understand you think for a Section 2 vote denial case, the challengers need to show either an effect on registration or actual voting. How do we do that? What's the standard? What's the test? And what authority would you point us to for that? Well, I would say in, first of all, Clement's, the best case for the proposition, you have to show voter turnout or registration. Now, that's just the first part of a prima facie case under the results test. You'd still have to show causation. You'd just have to show that what was — the challenge law was causing the voting disparity. And even then, you'd still have to show that it was on account of race or there weren't valid governmental objectives, because the further you get away from looking at voter turnout and voter registration, the more and more this is not congruent and proportional to the constitutional right being protected. Well, let's say Texas decided it's too expensive to run all these polling places. Texas has thousands and thousands. Decides to cut the number of polling places in half, and the closed polling places are disproportionately in minority neighborhoods. You would say you have to wait, wait for an election, wait for political scientists to study whether this had an effect on voting before anyone could even have a chance at challenging that? Well, insofar as you'd be talking about a pre-enforcement challenge, I think you'd have to marshal evidence that there would be a substantial likelihood that that would in fact occur. But again, that's not looking at, for instance, pre-existing ID possession. That would be making a fact-finding about what will happen to voter turnout and registration, and you would need more than just mere speculation, and you need more than simply that election laws will have marginal burdens, and those burdens will fall upon those with less income more, and less income is correlated with race. Yeah, that's the precise theory that was adopted by the district court and is now being pressed by plaintiffs. But that would apply to voter registration laws, large elections. Isn't it correct, Mr. Keller, that at the present time that standard of a combination of disparate results and socioeconomic effects applies only in the Fourth Circuit, because no other, the Sixth Circuit decision was vacated, the Ninth Circuit en banc required causation, the Seventh Circuit required causation? Absolutely. And what I would also say to that is that was in a preliminary injunction posture, and the North Carolina District Court made detailed fact findings about how that theory would sweep away all election laws, just like Frank noted, and that is why in a Section 2 context it's important that Clement stressed that depressed minority participation must be shown, because if it's not, then it's going to be an unmoored test. Well, let me ask you a question. Maybe I'm missing something here. First off, as I viewed this as an applied challenge, but more to the point, am I missing something? You mentioned Indiana and Georgia and these other states, but in looking at them as comparatives, they offer infinitely more options to the photo ID process than in Texas. On the face of it, it appears Texas had the strictest of all the laws that were enacted, yet had the fewest ameliorative benefits. Now, my point is, as I'm reading it, the Voting Rights Act speaks to denial or abridgement of the right to vote, which has nothing to do with turnout. It's abridgement or denial. Even Crawford and those cases speak to abridgement or turnout. Now, are you saying it's totally inconsequential, irrelevant, the evidence in this record, not statistically, but of all those people who testified that they were deterred, burdened by the cost, didn't know about this law, et cetera, are you saying that doesn't speak to abridgement, that that's totally irrelevant? We're only looking at turnout, how many people came to the election? I believe it's important to separate the Crawford as applied claim from the Section 2 discriminatory effect claim. Insofar as you'd be looking at a turnout disparity, that would be going to a prima facie case under Section 2. Insofar as you'd be looking at a Crawford as applied claim, you'd have to look at the individual and see, has there been a substantial burden? But I would suggest, though, that most of those anecdotes break down on examination because the voters could either vote by mail without ID. Well, let's go to that point. You're not really responding to my question, but I understand that. I mean, Crawford, as I recall it, I mean, that was Sarah Barker. It was cross motions for summary judgment. She did a 70-page opinion. She says this evidence is not fair. The opinion of Crawford says on this record, blank. All right? Here, we don't have that. Even in Frank Warren, we have a full trial on the merits of all this evidence, undisputed, the experts both sides, et cetera. And there's testimony, not just statistics. Even in the North Carolina case, statistics. But here, there's evidence about abridgment of the right, changing SB 14, didn't know it, couldn't vote, et cetera. So is your argument that all of that is totally legally irrelevant to the inquiry that we should be focusing? I don't believe it's irrelevant to the Crawford as implied violation, but it's not sufficient. And the reason is Section 2B says that what denial or abridgment is, is an equal opportunity. It's not that there must be a disparate outcome. It's that can someone obtain ID? Well, how does one have a... One last follow-up, and I promise that. How does one have equal opportunity to vote if they need a photo ID, and the people in this record testified that they were totally unaware of the need for the ID until they went to the polls and were told that they couldn't vote because they didn't have the ID, which would then go back to the question, if you're comparing to other states, where they spend infinitely more money educating the populace, et cetera. So... Well, first of all, and this is in the record at 101-09596, the Secretary of State's office spent $400,000 from their own budget from September to November of 2013. Also, the Secretary of State's office spent $2 million in 2014 educating voters about SB 14, radio, TV, print, digital ads, a public relations tour by the Secretary, college campus tours. And I could go down every one of the individual named plaintiffs and explain why they could either vote by mail without ID or they either had ID. Some did, in fact, vote even before the time of trial. Well, I'll yield on my question. I cut off Judge Jones and I apologize. So back to Judge Jones and then to Judge Higginson. Thank you. Judge Jones. You would agree, would you not, with Judge Easterbrook's formulation in Seventh Circuit as to whether under a proper interpretation of Section 2, it is questioned whether the state makes it needlessly hard to vote. Would you agree with that? Yes, because it's about a denial of equal opportunity. All voting laws are going to have some marginal additional burden, but that cannot possibly be the test for a Section 2 or a Crawford claim. Just quickly on the equal opportunity test that you're urging, which I see Easterbrook's suggesting it as well. Three quick questions. Does it depend on the distinction between voter dilution and voter denial claims, or do you see that that test is in Gingles? That's the first question. Second of all, is your equal opportunity test consistent with Justice Scalia's chiseled hypothetical that we should assess laws in connection with the minority's ability to get access to transportation? That's second. Third one is, if literacy tests weren't separately prohibited, would a literacy test be invalidated by your proposed equal treatment test? Actually, my time has expired before my answer. As I said, the red light doesn't rescue you from the question. Even a three-part question you've got to answer. So taking your first question first, I think the Gingles and vote dilution claims, which are distinct from vote denial claims, under Section 2B, that would be under the opportunity to elect representatives of their choice language, as opposed to less opportunity to participate in the political outcomes. So I don't believe the theory that we're urging here would touch vote dilution claims at all. As to the second question about Justice Scalia's chiseled hypothetical, I believe there, first of all, there's an actual showing of a disparity in voter registration under that hypothetical. And interestingly, Justice Scalia cites a law review article for this hypothetical, and that law review article cites an actual example from Georgia, where in 1967, when federal election monitors were put into a jurisdiction, voter registration was 30 percent higher than it was later. And so what Justice Scalia was talking about there was a massive drop in registration. And I would also suggest that any time there would be that much of a registration disparity, you're going to be able to also show a voter turnout disparity. So I don't believe that those two are inconsistent. Insofar as literacy tests go, first of all, that would be obviously separately banned under this side of the section. I believe insofar as you're putting aside the separate banning and insofar as you're putting aside a purpose claim, I think you would still ask, is this a denial of equal opportunity? And in that scenario, you'd have to show a prima facie case. And it would almost certainly, in the relevant jurisdictions that we're talking about, have been able to show a voter turnout disparity, particularly, you know, Operation Push versus Mavis would have been another case like this where you had legacy systems in place, and under those legacy systems, there would have been liability. All right. Thank you, Ms. Geller. You're a star at remembering all three parts of that question and being able to get that answer back up. Thank you. You've reserved your rebuttal time to come back up later. All right. Ms. Flynn of the United States, as I understand, you have a portion of uninterrupted as well. Is that right? All right. May it please the Court, Aaron Flynn on behalf of the United States, consistent with our claims, I'll focus on the Section 2 violation. After a 10-day bench trial, the District Court issued a methodical 147-page opinion in which it found that Texas's photo ID law, SB 14, violated Section 2 of the Voting Rights Act for two independent reasons. First, the District Court found that SB 14 has a discriminatory result on African American and Hispanic voters within the meaning of Section 2. And second, that the law was enacted at least in part for a discriminatory purpose. In its detailed analysis, the Court applied settled legal standards. Critically for this Court's review, the District Court committed no legal error. The factual findings are reviewed only for clear error. And as this Court is well aware, the findings are accorded great deference and must be affirmed so long as plausible in light of the entire record. This standard applies with particular force to Section 2 claims, which the Supreme Court has said are peculiarly fact-driven and context-specific. Here, the Section 2 findings were not only plausible but eminently reasonable. Before inviting the Court's questions, I'd like to speak briefly to the Section 2 findings. On the results side, Section 2 requires courts to examine the design and impact of a contested practice in light of race-based social and political conditions to determine if minority voters have less opportunity relative to other voters to participate in the political process. That's exactly the standard that the District Court applied here. In examining SB 14's impact, the Court found that minority voters disproportionately lacked one of SB 14's limited forms of identification. The Court further found that Texas' process for obtaining ID is onerous, given the significant travel required to get to relatively scarce and often distanced DPS locations, the lack of public transit, the absence of voter education and outreach, the failed EIC program, the need for underlying documents, the nonexistent publicity of low-cost documents, all of which result in significant time, expense, and travel. The Court found that those burdens fall disproportionately on Texas' African American and Hispanic citizens who face present disadvantages that are traceable to past discrimination. They are more likely to live in poverty, to lack access to a vehicle, and to rely on public transportation. The Court examined the nonexhaustive list of factors from the 1982 Senate report and, consistent with Jingles, found that SB 14 amplifies the effects of current and lingering race discrimination. Likewise, the finding of discriminatory intent is amply supported by the record. The Court analyzed the categories of evidence that the Court identified in Arlington Heights is relevant to a purpose inquiry, and it made findings consistent with Hunter and Feeney. The Court found that the combination of Texas' rapidly growing minority population and highly racially polarized voting provided an incentive for the legislature to pass SB 14. The Court found that the legislature disallowed IDs disproportionately held by minorities, refused to adopt mitigating measures, and rejected out-of-hand calls for minority impact studies and targeted outreach, all despite repeated hearings in which it was evident that SB 14 ID would be difficult to obtain, that minorities would be most affected, and that the potential for fraud lay elsewhere. It was certainly plausible on this record for the District Court to find that SB 14's specific provisions were passed for a discriminatory purpose. Not all voter ID laws violate Section 2. SB 14 does. I'd invite the Court's questions on the Section 2 violation. Counsel, I only have two questions. I can't quite match Judge Higginson. I'll ask them separately. First, do you agree with Judge Easterbrook's concern and the First Frank's opinion about the two-part breakdown of what Gingles means, and basically that it is necessary to show the social and historical conditions that Gingles was talking about are the result of state action? Sorry, that's the first part of the question. I wasn't sure if you were going to ask the second part at the same time. Ask them one at a time. The Chief will allow me to ask the second one when you're finished. Okay. As to Frank, I would say that that case is an outlier in terms of Section 2 results jurisprudence. It was controversial even within the Seventh Circuit, and this Court should not follow Frank for numerous reasons. The first is that, as I said, it breaks from Section 2's task. The question I have, though, excuse me, but specifically, is he correct that on whether the social and historical conditions are a factor or not, that if they are a factor, they need to derive from past state action? No. So I think that Frank misunderstands the relevance of the Senate factors in the Section 2 results task. You can answer somebody else's question, but my question you've already answered. The second question is, if that is the case, and getting to what several of me have talked about, Mr. Keller just talked about it, where is the limiting principle? It's one, I don't know if it's your brief or one of the others, talk about the parade of horribles that various different briefs have discussed,  or if you say that every election practice has to be judged about its effects on minorities of one category or another because of the results of historical conditions, it does seem to me that every election practice is subject to the problems of poverty and disparate effects because of the problems of poverty. So I'm just looking for a place to draw a line, and if you could identify that for me, why everything isn't sort of up for debate because of the way that you read Section 2. Yes, Your Honor. So I think an important limiting principle, these are all context-specific, fact-specific inquiries. The limiting principle is that plaintiffs have to establish that these are material burdens on the right to vote. Here, the record evidence is in no way clearly erroneous, where, as I said in my opening, the court found that DPF locations are far away, it's significant travel even if you have the underlying documents to get to them. Excuse me, did the DOJ intervene or participate in the recent litigation in North Carolina or in Virginia? The DOJ is a plaintiff in the North Carolina litigation. Well, didn't the North Carolina litigation also challenge the removal of same-day registration, the not counting of out-of-precinct ballots, some of the requirements of voter registration? It was a global challenge to a whole bunch of election regulations, was it not? It was a challenge to an omnibus bill. So where's your limiting principle because you attacked every single feature of that omnibus bill? I would note critically, Your Honor, that the DOJ did not press exception to a result claim on the North Carolina voter ID law after the state amended that law to include a reasonable impediment exception. And in the department's view, that exception, which allowed voters affected who lacked this sort of North Carolina ID to cast a ballot that counted at the polls, was sufficient to alleviate our concerns given the accompanying education, assistance, and outreach. So why isn't that sufficient security? If there were a violation here, wouldn't that be sufficient security in this case? Well, Your Honor, the state is, A, contesting the violation, and B, has never asserted that that would be a remedy that would be appropriate. I'm asking you a question. In the department's view, something that looked like the North Carolina and South Carolina reasonable impediment exception would remedy, depending on how it was constructed and ensuring that it had education, outreach, assistance, and notice to affected voters that they would still be able to vote under this affidavit impediment exception, would alleviate our concerns here as to the results violation. It does not mean on the purpose claim that the district court erred in striking down the law in its entirety. Well, let me ask you about that purpose claim. When was the last time, in your recollection, that a federal court has declared the act of any legislature or legislative body unconstitutional as being enacted with a racially discriminatory purpose? Well, Your Honor, in 2006, the Supreme Court in the LULAC decision said that the state legislature's Congressional District 23 gave rise to concerns over an equal protection violation. That's not, well, concerns is not approving a finding of intentional violation. And so when was the last time? Your Honor, here in 2014, I believe it was, maybe 2012 or 2014, the three-judge panel in Perez v. Perry on a preliminary injunction found that the state's drawing of House District 117. Let her answer. The North Carolina case. Let her answer your question. And if you have a follow-up, then let her have it. If you finish answering, Judge Johnson. So as to the state's legislature's drawing of House District 117, that three-judge court found that there was marks of impermissible reliance on race discrimination. We realize that that decision is still pending, but in honor, in answer to your question, within the last two years. But that wasn't for racially discriminatory. For racially discriminatory. Well, that was vote dilution, was it not? Well, it's a Section 2 intentional discrimination purpose claim. I'm curious, in elaborating the answers to Judge Southwick's two questions, but going to the second one first, as to whether there's a limiting principle to the two-part Gingell's test. Does the North Carolina district court decision show that it isn't limitless? In other words, did the district court apply the very Fourth Circuit case that opposing counsel is saying would always lead to invalidation? I think as to the voter ID portion of the decision where the court looked at, the burdens are no longer existent on those voters. Whether you agree or not, that was the district court's conclusion applying that. Exactly. And it was also focused on the extensive outreach by the state and the assistance available to affected voters at the poll. And then I am interested in, you started to say Frank and Easterbrook aren't persuasive for these reasons, but I'd love to hear quickly. There are a number of things I think Frank broke from the statutory text, which is less opportunity, not no opportunity. It broke from Gingell's, which looked at and interpreted the totality of circumstances language, and that interpretation was taken from the authoritative Senate report. The language applies both in the Section 2 vote dilution and vote denial context. I think Frank completely ignored the abridged language in Section 2 that Judge Stewart was referencing earlier. There was no totality of circumstances or Senate factors. Okay, and just as my time's up, last question, a harder question. Is the government's position here in tension with the value given in Shelby County to equal sovereignty? I don't believe so, Your Honor. Shelby County was particularly concerned with the specific federalism burdens under Section 5. Here's the plaintiff's burden, as in any other litigation, to show that the law has a discriminatory result and has a discriminatory purpose. Those sorts of federalism concerns were not raised here. The court in Shelby County specifically said that Section 2 persists as the nationwide prohibition on race discrimination in voting. Could I ask a question? Who was it? A follow-up. So if we were to apply Frank 1, as informed by Frank 2, which Frank isn't over, but anyway, if we were to apply Frank 1, do we have in Texas a history of state-sponsored discrimination that brings us to where we are today or not? Yes, Your Honor. So do you lose under Frank 1, whether it's a good test or not? No, we don't lose under Frank 1. And I want to be clear that we do here have state-sponsored discrimination, and the state-sponsored discrimination falls in the Senate factors analysis under both Factor 1 and Factor 5. And often, because the factors aren't dispositive, you don't necessarily need the state-sponsored discrimination, though, where racial politics are particularly extensive in the jurisdiction and where Section 2 is concerned about correcting an active history of discrimination, perpetuating past purposeful discrimination, those are conditions that plaintiffs are generally going to be showing and that will exist for the court to have a results violation. Judge Elrod and then Judge Jones. Okay. I don't understand the answer to Judge Haynes' question because there's not a showing that the challenge voter qualification caused the disparity, as Gonzales articulated. The causation in Gonzales and the causation under Section 2, Your Honor, is that it's the state's imposition of the practice that amplifies the effects of current and lingering race discrimination. And so you don't have to show that the law created the pre-existing conditions, but you do have to show race-based pre-existing conditions that, with this law, make it more difficult for minority voters to vote. I do want to ask you about the remedy. Yes. You know, we define as facial or as applied by the breadth of the remedy thought under Citizens United. Breadth of remedy thought. Your remedy is injunction of the law. That's a very broad remedy thought, which would be a facial remedy. I don't understand that you're not making a facial claim. Your Honor, the remedy was tied both to the purpose claim and the results claim. As to the purpose claim, given that the district court found this was enacted with discriminatory intent, it had to strike down the law. Assuming, arguendo, that there is no purpose claim. The remedy — Setting that aside, we agree that it would not be appropriate to strike the law down in its entirety, that the, you know, 94 to 96 percent of voters who have SB14ID could be required to show that ID at the polls, but that there would have to be a remedy as to other affected voters. And standing in the AG's shoes of being able to seek relief for affected voters, it would not be limited to the 14 named plaintiffs, as the state contends, but rather that it would have to be the class, essentially, of all affected voters, and it would need to be relief available at the polls that voters are both aware of and do not need to make on their second trip to cast a ballot. Mr. Walsh, you want to follow up on that? You sure? Yeah. All right. Any questions? All right. Thank you. Thank you. Ms. Nelson? Good morning, and may it please the Court. Janai Nelson of the NAACP Legal Defense Fund. On behalf of private appellees and appellee's intervenors, on the intent and result claims, my colleague, Chad Dunn, will follow on the right to vote and poll tax claims. The role of race in connection with the enforcement and enactment of SB14 simply cannot be ignored. Not only does SB14 have a sharply disproportionate impact on Texas' black and Latino voters on account of race, its purpose, at least in part, was to produce that very result. There are three categories of evidence that support the district court's finding that SB14 violates not only the Constitution but the Voting Rights Act, and if you will allow me two minutes to underscore why. The three broad categories of evidence are, first, the legislature's suspect selection and rejection of forms of ID and the racial consequences of those choices. With surgical precision, SB14's proponents selected photo identification that blacks and Latinos were least likely to possess and rejected other secure and less discriminatory forms of identification that would have alleviated that burden. For example, federal and state-issued employment identification. They offered shifting and unsubstantiated rationales for SB14, from unfounded concerns about non-citizen voting to counterfactual voter improvement in turnout. They suppressed from the full legislature their own studies that 700,000 Texans would be without the required ID and they acknowledged that the lion's share of those individuals would be black and Latino voters. The second category of evidence involved the extraordinary procedural departures that were deployed to ensure passage of SB14, starting with the remembering of the bill to give it priority, to bypassing the committee report, to the suspension of the two-thirds voting requirement, to the creation of a select committee. The complex cocktail of procedural departures that enabled SB14's passage resulted in a denial of process and support the finding of purpose. The third category is background, the racially charged environment in which SB14 was enacted. The 82nd legislative session contained repeated references to illegal aliens, it linked immigration to leprosy, there were proffered allegations of non-citizen voting and voter fraud that were unfounded, and a federal court found in that same legislative session that the legislature engaged in intentional discrimination in redistricting. As with redistricting, the legislature acted fully cognizant of the seismic shift in demographics that would make Texas the newest majority-minority state. The legislature could not change those demographics, but it could leverage Texas's extensive racially polarized voting by enacting the most stringent voter ID law in the country. SB14 stands as the newest link in a long history of a nearly unbroken chain of exclusionary laws that Texas has justified by voter fraud. Ms. Nelson, isn't it also correct that back in 1990 when the Texas legislature redistricted, three districts were confirmed to have been created specifically to assist minority congresspeople, and in fact a congressman, congresslady, what's her name from Dallas, excuse me for forgetting her name, so testified. We also know that... The continuity of racially discrimination, the discriminatory purpose in Texas. Well Judge Jones, we also know that every redistricting cycle since 1971, a federal court has held that the redistricting plans of this state have either been in violation of the Constitution or voting rights laws. And in Vera v. Bush, in which I sat on the pre-judge court, the violations had to do with the configuration of districts that were not in accordance with traditional redistricting principles precisely to elect minority congresspeople. I think the history of discrimination in voting in Texas is undeniable. Beginning with all white primaries, leading up to the more recent discrimination in Waller County. Well but even the panel here discounted that as admissible evidence to show discrimination in the last legislature. Well if I may address the panel's opinion about the relevance of historical discrimination. The panel's reading of Shelby County is broader than in fact the Shelby County opinion requires. Shelby County dealt very specifically with the issue of Section 4B of the Voting Rights Act and what the pre-clearance formula was. It said that historical discrimination was not the correct barometer for determining which state should be subjected to pre-clearance. The court said nothing about the relevance of historical discrimination in determining whether discrimination in fact occurred. In fact it left Section 5 intact and fully constitutional, which engages in a question about retrogression, and said nothing about Section 2 except to say that in fact the opinion had nothing to do with Section 2 and in no way made it any less robust than it was. So Section 2 has a different scope in states that have different histories? Is that your position? Absolutely. And that's permissible even post-Shelby County regardless of what the current conditions are? Correct. Section 2 requires a very fact-intensive searching inquiry and a local appraisal of the historical conditions and contemporary conditions of socioeconomic factors, voting discrimination, and many other Senate factors. Let me ask you a question. Is the NAACP, I think they were a plaintiff in the North Carolina litigation? We are the NAACP Legal Defense Fund, so we are a separate organization from the NAACP and have been. Well, are you involved in the North Carolina litigation? No, we are not. You don't know anything about it? I certainly do. Well, okay. I read in some reliable publication that that decision, which upheld a bevy of changes to the election laws in North Carolina, is on a, quote, fast track for appeal. Would it be your view that the district judge in North Carolina misinterpreted and misapplied Section 2 in upholding all of those voter regulations? I would say that this Court is required to focus on the extraordinary law of SB 14, which is vastly different from the one in North Carolina. Well, no, I'm sorry. I'm getting at a slightly different question, and that is, what is the limiting principle? Let's assume we're not talking about a discriminatory purpose. Same question that other judges have asked. What is the limiting principle for application of Section 2 if one adopts the so-called two-part text? The limiting principle of Section 2 is in the text of Section 2 itself. It says that we look for denial or enrichment of the right to vote on account of race, and we are enabled by nine Senate factors, which are non-exhaustive, but nine Senate factors that guide the Court in a searching, highly fact-intensive inquiry. Suppose that City of Houston is going broke, and suppose that we had mayor and council elections, and to save money, the City of Houston reduced the number of polling places. Would that be subject to a Section 2 challenge? It would depend on where those polling places are located. It would depend on what the ultimate impact of the closures were, the justifications for determining that those should be closed, and the context in which that decision was made. What we have here is a very concerning context in which SB 14 was passed. The session was rife with racially animated commentary. The procedural departures were extraordinary, and there was a careful selection that resulted in a significant disproportionate impact on Texas' minority voters. The constellation of those facts support the District Court's well-supported, fact-intensive, 147-page opinion that determined that there was a Section 2 violation, both on intent and results. I see that my time is up, if there are no further questions. All right. Thank you, ma'am. All right, Mr. Dunn, you're up, and as I understand it, you have no uninterrupted time. Is that right? Yes, Your Honor, that's correct. May it please the Court, my name is Chad Dunn. In my time before the Court, I'm going to focus on the as-applied right-to-vote challenge. Judge Jones, you mentioned earlier in the argument today that the question here is whether there are restrictions in Senate Bill 14 that are needlessly hard, and there are restrictions in Senate Bill 14 that are needlessly hard. For example, the Department of Public Safety issues a number of employee IDs in a similar fashion to the IDs permitted under Senate Bill 14, but those IDs can't be used, despite the fact that they're often held by more black and Latino citizens and poor citizens. Also, in order to get the disability exemption, in order to vote by mail under Senate Bill 14 without an ID, one has to have certification of disability from the Social Security Administration or the Veterans Administration. Yet, if somebody is disabled and wants to vote by mail, they check by box. Again, no justification for the State. Furthermore, the EIC birth certificates that weren't free until this lawsuit and the District Court opinion were issued, the EIC birth certificates you can only obtain if you go down to the birth certificate office, whereas others you get… I beg your pardon? No, thank you, Mr. Dunn. Well, I always appreciate your arguments. The thing is that there's no evidence here of connecting lack of birth certificates with inability to vote. None. Well, at the record, at page 43586, the survey that was performed by Dr. Brito and Dr. Sanchez said 26.1 percent of the people, that's 1.2 million eligible voters, 600,000 registered voters, lacked one of the underlying documents that they needed to get the ID. Ninety percent of the people who didn't have the ID, in fact, were going to face a material burden, a special burden, as Justice Stevens called it in the Crawford opinion. But on the EIC birth certificate, you have to go down to the office to get one of these so-called free birth certificates, whereas if you can pay the fee, you may do it by mail, you may do it by internet. And the State has done nothing today, earlier in this case, and in this record, to justify these individual choices. And that's where the State goes wrong. The State plays Crawford as a trump card and asks you to not look at the plaintiff's cards. And you should, because the details in this law are what make the difference. The details in this law that have never since been justified is what makes it unconstitutional. Can we? Just one quick question. Is it not correct that three circuits have rejected the Crawford challenge following Crawford? Under vastly different laws, that's true. Under laws that provide an opportunity for individuals to vote, whether by affidavit or by some other procedure they can fill out later at the office. The simple reality is Texas has said all along to its legislatures at enactment that we're just copying Indiana, but they didn't. They didn't copy Indiana. And there's a reason for that, and they've yet to give you the explanation. And that's why Crawford says that there should be an as-applied remedy to this law. I want to look at your plaintiff's cards, as you said in your argument. What remedy would apply for your plaintiffs if the discriminatory purpose is out of the case? For your plaintiffs, your plaintiffs have IDs for the most part, don't they? So what remedy would your particular plaintiffs need? Well, I have to disagree with the court's opinion. Okay, maybe that's why. Help me. So, for example, Calvin Carrier, at the record, didn't have an ID and had gone and tried to vote, was recognized by poll workers, wasn't allowed to vote, wasn't given a provisional ballot. Mr. Lara, who unfortunately has died in the pendency of this case, having not gotten to vote in the last few elections, didn't have an ID. Okay, so what remedy for your plaintiffs under Section 2 without the discriminatory purpose? What remedy do you seek for your clients specifically? Yes, Judge. So we understand the panel decision, which is persuasive authority, we understand at this point. But it got the remedy portion right, and it proposed several remedies that would deal with the as-applied challenge. One is, as the State suggests, an indigency affidavit process. Another is return to the use of the voter registration card, as the panel suggested. There could be others crafted based upon the evidence and record on the ground. Now, are you talking Section 2 or Anderson verdict? Or are you collapsing them? No, in my time before the Court, I'm talking about Anderson verdict. That's what I thought. And, you know, it seems to me that we're bound by the finding in Crawford that the State has a very legitimate interest in attempting to combat in-person voter fraud. But it is a matter of legislative fact, as Judge Easterbrook put it in Frank, and a matter of law, as Judge Higginbotham put it in Lula. And, Your Honor, you're right again. That's absolutely what Crawford found. But what you have to do is you have to go back to the original question you asked the State, whether the changes in this law were needlessly burdensome. You have to balance those legitimate factors of the State. That's Section 2, as talked about in Frank. That is not the Crawford verdict. Unless the two are now one and the same, which was very confusing to me in the briefing, Anderson verdict has to raise the State interest very high on the scale. Not that it can never be overcome, but it's certainly not subject to results in the same way and opportunity to participate in the same way. Well, if I could call the Court's attention to page 191 in Crawford. Justice Stevens there talks about weighing the burdens however slight. And what he said in that case is because there was no evidence of the burdens, then this legitimate interest of the State could offset it, and there was no Anderson verdict violation. But here what's different is you have a Rule 52 protected factual finding by the District Court laying out in detail the enormous burdens. And also analyzing, although legitimate, the District Court recognizes the interest of the State, how do those legitimate interests end up lining up with the individual floors and construction of Senate Bill 14? And according to the District Court, and really according to a review of this information, they don't line up, those examples I gave. 96%, you know, which is a conservative estimate in my view of Texas registered voters, have driver's licenses. That's bottom line. And we contend the State could continue to require them to show identification. But as Judge Easterbrook said in the recent Frank Two decision, people who put reasonable effort and can't obtain an ID are entitled to relief whether it's one person or 1,000. I just wanted to ask, if something close to the panel opinion were reinstated, Supreme Court denied cert, and the judge on remand, in reweighing the factors on the purpose, found the contrary of what she found before. So we're just talking about effect, and we're now to the remedies section of the panel opinion. What do you see happening in the District Court at that point? I see the District Court taking a day or two of testimony to determine what, how various remedies might work on the ground, hearing from election observers, election administrators, as to what process could be put into place, and then selecting probably from the menu of proposed solutions in the panel. So you don't think you can work with the State at the District Court level? Well, I don't want to get into some of the discussions, but I can tell you that we've done everything we can to work with the State, and we're here today. If I may take a minute to conclude, I see that my time is up. Every once in a while a case comes along that defines the event horizon of our democracy. I'm going to give you one sentence, a conclusion, but you can't make a speech. I understand, Judge. The District Court was correct to throw this law into the dustbin of history. This Court should affirm it on all four claims in all respects. All right, no commas, no semicolons. All right, Mr. Keller, back up for rebuttal. May I ask you to address that same question, that same hypothetical that I just gave your counsel opposite on, you're back at the District Court on effects remedies. Can you work with the plaintiffs on that, or do you have to have another hearing and more findings from the District Court, more appeals to us, and more hope for CERD and all of that? Our position, obviously, is there's no liability. However, if there were to be liability found, and I don't believe there could be an opinion written to Cabin Section 2 in that way, but if there were found, yes, we could work with the other side. As far as what that remedy would be, though, I believe that an Indiana agency affidavit procedure would be what's targeted to get at the socioeconomic disparity. So why didn't the legislature pass that in the first place? I mean, the thing that was interesting to me is after the oral argument, in this case, they ran out and did SB 983, they got that message, but they didn't seem to get the message that their Indiana-like statue wasn't anywhere close to Indiana. And yet now you're saying, well, they just need to follow Indiana, which they've been claiming they've been doing all along but kept rejecting all the amendments that would make them like Indiana. Judge Haynes, what I would say is Indiana in Crawford was not an outer boundary of legality. And insofar as they're bringing in Crawford as applied challenge or a Section 2 claim, first of all, in Section 2 theory, as you've heard, there is no limiting principle to the theory that the plaintiffs are suggesting. Clements, though, this court, 23 years ago, set forth— You keep saying there is no limiting principle. Don't you have some Senate factors that you have to apply? But you could repeat the same analysis here for any election law. Well, insofar as the court would say totality of the circumstances is an analysis to be done, yes, but I would suggest that that is not cabining it because if socioeconomic disparities correlate— Your position is the factors don't serve as any limiter at all. There is no limiter. I think the factors would serve as a limit on is something done on account of race. As to show if there's a prima facie case, what Clements said was you have to show the minority participation is in fact oppressed. And that's exactly, Judge Higginson, what the North Carolina court said. It quoted the court for that proposition. It said there must be an inequality of opportunity. This is in the 28-J letter we filed. And in the court's words, the inquiry under plaintiff's Section 2 theory is inherently standardless and highly problematic not just for this case but for the fabric of the law. And the reason for that is because you could show a disparity that's not connected to turnout participation in virtually any election case, combine that with socioeconomic disparities, and all of a sudden all voting laws are in jeopardy. I've got two questions. One, help me understand. Indiana's been presented. We got a 28-J letter about the Virginia ruling which occurred, you know, what, a couple days ago. But in Virginia, Virginia has 13 different ameliorative options for people with a photo ID. The governor of the state of Virginia in the process, you know, granted ameliorative processes. So when the district judge, Judge Hudson, found no violation, it's all of those. Wisconsin has eight. Mississippi has 13. Kansas has 17. Arkansas has 13. Texas has what it has, seven. I'm not understanding if it said we're like Indiana, we're like Wisconsin. Yet within those, all of those findings found that those states had a wide range of ameliorative facts including allowing college IDs, federal IDs, et cetera. So if the purpose is to prevent voter fraud, and I haven't heard anybody say that that's an illegitimate purpose of the state. It's said by the district court. I haven't seen anybody say that's not. But the question is what is the justification, if you can help me with, why in saying we're like those other states, Texas is saying the seven we have is all that's needed and Crawford gives us a green light to do that. There's something about it. I'm just not understanding. Absolutely. So our opening brief at pages 48 to 51, we lay out the explanations for why the legislature said it was limiting the IDs in the context it did. Beyond the explanation, though, there's no evidence in the record that allowing any more of those IDs would have closed the disparity. For instance, our brief lays out that the various states that do allow college IDs limit those in various fashions. Stop you there. I know you're trying to answer my question. As I read it, and maybe I've got it wrong, the evidence in the record and as Texas put forth, the greatest levels of voter fraud in Texas occurred with respect to mail-in ballots. Yet this bill was enacted to deal with in-person fraud where there were only two people ever being convicted of in-person fraud. Yet Texas takes the position that the option for the people to testify is mail-in ballots. So help me understand the connection between the greatest disparity found in voter fraud is mail-in, yet that's the option that Texas says should ameliorate the problems complained of. Legislatures don't have to solve all the problems in one bill. Here, in light of Crawford— I never said he did. I'm just asking. And here what the legislature was doing was targeting in-person fraud. But also, unlike Crawford, we have evidence in this record of cases of in-person fraud. We also have evidence of registration fraud. Twelve counties had more registered voters than voting-age citizens. The plaintiffs' expert committee conceded that photo voter ID laws also deter registration fraud. Don't you also have evidence where there are 254 counties in Texas? You've got, what, 88 that have DPS offices. Some of these places, San Antonio, don't have DPS offices. People got to drive to get— I mean, isn't that evidence in there? Doesn't that count for something? In Georgia and Indiana, they talk in those opinions about the proximity of places where people could get photo IDs. So in balancing the state's interest, it's like, well, people can do that. But, I mean, what do you do with the 200-and-something counties where there's no DPS office? Well, 99.95% of Texans live within 50 miles of a DPS office, 98.7% within 25 miles. So if you don't have a car, what does that do? Even beyond a DPS, we have a homebound program. This is 100, 515 to 16. We have a full-time program that issues IDs outside of DPS offices. Forty-five counties without an issue have tax assessor offices, county clerks, election administrator offices. We have mobile EIC units, mobile units giving free IDs. Every county had a physical location where you can obtain an ID. That's at 100, 616 to 21 in the maps at 97240. All right. I don't want to dominate. You're responsive. I think somebody else had a question. I didn't mean to tie you up too long. In other Section 2 cases, courts have found that actual analysis of voting patterns can yield counterintuitive results. For example, in the North Carolina case, they found data that was compelling, that early voting actually diminishes rather than increases voter turnout. What evidence in the record indicates a decline in minority voter participation based upon the voter ID requirement? I would say in this record that isn't there. There are experts, Ansela Behar and Maniti, had previous studies that didn't find any disparity in turnout. The Project for Fair Representation's amicus brief at 26 to 29 goes through voter ID studies finding no decreased turnout. The Sakharov Law Review article, I think, canvases those and says that there hasn't been any findings. So even with the statistical findings on the predicate question, there's not a causal link between, there's not a statistical finding or peer-reviewed studies that the voter ID decreases the turnout. Is there in this record? I'm not talking about in the, can I look on the Internet and find it. Is there in this particular record? In our opening brief, we cite the Ansela Behar and Maniti examples, and the Project for Fair Representation's amicus brief shows that virtually all the studies have found no correlation between the two. And that's why the limiting principle is so important, because even if there's an ID disparity, a pre-existing ID disparity, there would still have to be a turnout disparity, or else this is not going to be congruent and proportional to the constitutional guarantee, and it's going to sweep aside various election laws. The government takes the position that turnout data are irrelevant to a Section 2 vote denial claim. Is there any support for that? Clemens, Lulac v. Clemens. Well, I know that they're irrelevant. Oh, I'm sorry. No, of course not. That is the heartland, that is the crux of the claim. The North Carolina District Court canvassed and collected various cases on Section 2, dealing with voter turnout and voter registration in the vote denial context, because that is where the claim has to be tabbed, or else this is going to override all sorts of election laws that Congress couldn't possibly have intended in 1982 when it passed the amendment. I'm just going to—never mind. Nope, nope, nope. Back to John. Since several elections had been conducted under the voter ID law before this case went to trial, couldn't the plaintiffs have put on that evidence? Yes, we had three statewide elections, five local elections. They didn't even try to put on that evidence. And also, if I could finally close on the purpose point again. They got unprecedented discovery. The polling showed an overwhelming number of Texans, including 58 percent of Democrats, 63 percent of African Americans, and 68 percent of Hispanics supported voter ID. There is a small disparity here. Isn't that true, they supported it without knowing what the devil it was going to take in order to get it, that there was going to be an office somewhere, there was no education provided, et cetera? Texas didn't do any of that, as the other states. Do you dispute that? I mean, is this a case of what the plaintiffs didn't put on and ignore what the plaintiffs did put on? Is that the state's position? This was all about turnout, and there's no evidence in the record about turnout, but there's tons of evidence about we couldn't get there, but that's irrelevant. Is that what you're saying? Chief Judge Stewart, there is not a ton of evidence about we couldn't get there, especially not in counting for the fact that voters 65 and older, the burden can't be examined on did they show up to get an ID, wholly separate from whether they can vote by mail without ID. And if I could finally close on it, Clements recognized that while there was historic discrimination, that was no longer a basis to infer that a lasting legacy of discrimination had somehow intruded upon all of the state's election laws. Clements rejected that 23 years ago. The court should do so here in Cabin Section 2. Look at the actual anecdote, the evidence of the individuals, find no Crawford as applied violation, and reverse and render on all four. All right. One last question. I had acknowledged Judge Higginson, and I failed to get him to indulge. I was trying to listen. You mentioned the law review article. In that same spirit, since there isn't that much Section 2 case law since the pre-grants formula was invalidated, so in part we're forced to really look at Easterbrook closer, but yet there's a lot of scholarship. Can you direct me to the single best legal law review article scholarship that presents fairly the competing interpretations of Section 2? Just the one one you would refer me to, sort of considering these different views of the Gingels to Parfait. Well, I think the Sakharov article on voter ID would be the one to look at. However, I'd also note, though, that when you're talking about Judge Easterbrook and Judge Posner, Judge Posner's separate opinion in Frank was focused on the Crawford, the Anderson verdict. Judge Posner, I don't believe, was talking about Section 2 because Sakharov is your answer. All right. All right. Thank you, counsel, for all sides. We've got 100,000 pages of briefs, and we've got your argument. The case will be submitted to the in-bank court. Before we take up the second case, we'll be—